UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
MUKUL BARUA,

        Plaintiff,

       - against -

CITY OF NEW YORK,
NATHAN CAVADA,
"JOHN DOES" and
"JANE DOES"

        Defendants.
--------------------------------------X

MEMORANDUM AND ORDER

14 Civ. 584 (NRB)

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE


    Plaintiff Mukul Barua ("Barua") filed this action against defendants the City of New York (the "City"), Nathan Cavada ("Cavada"), and John and Jane Does, alleging violations of his rights under 42 U.S.C. § 1983, the Constitution, and New York law. Currently before the Court is defendants' motion for summary judgment dismissing Barua's complaint in its entirety. For the reasons stated below, defendants' motion is granted.

    Drawing on the parties' Local Rule 56.1 submissions and other submissions, we summarize the facts, noting matters in dispute.[1]

---

[1] Defendants argue that, in light of problems with Barua's response to their Rule 56.1 statement, this Court should disregard Barua's Rule 56.1 response and each paragraph in defendants' Rule 56.1 statement should be deemed admitted. Barua's Rule 56.1 response fails in many instances to cite admissible evidence supporting its contentions, is overly argumentative and verbose, and offers non-responsive objections to that miss the point of Local Rule 56.1. Although the response is deficient in these respects and made deciding this motion more complicated than it should have been, it also contained some proper responses,

On Wednesday, July 6, 2011, sometime between 5 p.m. and 6:30 p.m., the plaintiff and defendant Cavada, a police officer (now a detective) with the New York City Police Department assigned to Transit District 4, were on the southbound platform at the 42nd Street Grand Central subway station in New York City.  Plaintiff, a dark-skinned male of Bangladeshi descent who was 33 years old at the time, was there to take the 4 or 5 train to Bowling Green near his place of employment.  Cavada was on duty with NYPD police officer (now sergeant) Andrew Chin.  Both officers were in plainclothes.

Barua, Cavada, and Chin boarded the downtown 5 train.  At the 14th Street Union Square station, Barua, who was standing by the door, temporarily exited the train to let passengers off of the train, and then re-entered the same car.  (Cavada testified at his deposition that Barua re-entered through a different door on the same car.)  Cavada and Barua agree that the train was crowded. Indeed, Barua acknowledged that the train was so crowded that his

and Barua has provided relevant record citations and exhibits elsewhere in his opposition papers.  "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001), including Local Rule 56.1, see Carrillos v. Inc. Vill. of Hempstead, 87 F. Supp. 3d 357, 365-66 (E.D.N.Y. 2015).  Ultimately, as in Carrillos, "both the Defendants and the Court are aware of the portions of the record upon which plaintiff relies in opposition to the motions, and Defendants have not identified any prejudice arising from plaintiff's failure to comply with Rule 56.1 court."  Id.  Therefore, this Court denies, with some reluctance, defendants' request.

body was touching other people's bodies.  Barua Dep. Tr. 44:21-24.[2]

Cavada testified that a woman of Asian descent, who later gave her name to Chin but whom we will refer to as "P.S." to protect her anonymity, also boarded the train at 14th Street, and that Barua got directly behind her on the train.  Cavada testified that he was standing "across from" Barua in the train, about seven to ten feet away.  Cavada Dep. Tr. 18:23-19:4.  After the train left the station, Cavada saw Barua "bump [P.S.'s] buttocks with his groin."  Cavada Dep. Tr. 17:4-7.  P.S. moved to her left and looked behind her shoulder to see what had bumped her, Cavada testified.  Barua then allegedly moved behind her again, grabbed her by the waist with both hands, and continued to bump her buttocks with his groin area.  Chin, who was in an adjacent car, testified that he also witnessed, through the car windows, Barua press his groin onto P.S, and believed Barua had touched her inappropriately.  Chin also testified that he had seen Barua "trying to touch another female" earlier on the same train.  Chin Dep. Tr. 20:22-21:3.  Cavada testified that, based on his observations, he believed P.S. looked uncomfortable and had not consented to the contact, and that Barua had touched her inappropriately.  Barua testified that he does not know if he was

---

[2] Chin's testimony on this point differed from Barua's.

ever next to an Asian woman on the train, and denied ever grabbing or touching anyone inappropriately.

When the train arrived at Fulton Street, Cavada and Chin confronted Barua.  Barua testified that he again stepped off the train to let people out, and was grabbed from behind by the officers.[3]  Barua says the officers told him he was under arrest, showed him their badges and a pistol, and blindfolded him. According to Barua, the officers made him sit down on the bench, and then handcuffed him.  Barua testified that he saw an acquaintance of his, Mohammed Mamadu ("Mamadu"), on the platform when the officers first approached him, and that Mamadu witnessed Barua's arrest.[4]  The officers then took him to the Transit District 4 station house, only then removing the blindfold, Barua claims. There they booked him and informed him that he had been arrested for improperly touching a woman.

The officers' account of what transpired after the train reached the Fulton Street station is somewhat different.  Cavada testified that, once the train arrived at Fulton Street, Chin came up to him and told him what he had seen.  Cavada asked Barua to get off the train, and then pulled him off the train.  Cavada then told Chin to ask P.S. to exit the train, and Chin interviewed P.S.

---

[3] Barua claims that he had a bag (although he could not recall what type) with him at the time and that someone – he does not know who – took it from him.

[4] Mamadu was never deposed and has not submitted any declaration.

on the platform while Cavada had Barua sit on the platform bench, about 50 feet away.  (Chin testified that he was approximately 20 to 30 feet away.)  In their memorandum, defendants deny that the officers blindfolded Barua.  According to Cavada and Chin, the latter spoke with P.S. on the platform.  P.S., who was Korean and whose English was limited, spoke to Chin (in English) and confirmed to him that she did not know Barua and that Barua had touched her inappropriately.  At that point, according to Chin, P.S. wrote down three short statements in his memo book: "somebody touch [sic] me on the subway"; "he touch my waste [sic]"; and "he rubbed his body on me."  Chin Decl. Ex. A at 3 (memo book excerpts).  P.S. told Chin her name, date of birth, and email address but did not want to provide any other contact information.  She wrote down her email address in the memo book next to where Chin had written down her name and date of birth.

Because Barua disputes P.S.'s existence and argues that the memo book notes represent fabricated evidence, some description of the memo book entries is in order.  Chin states in his declaration that he is required to keep the memo book as part of his duties, and that it reflects his activities for each shift.  Chin declares that he writes his memo book entries "as soon as possible after each activity, but in any event, no later than the end of my shift."  Chin Decl. ¶ 6.  The memo book has lined sheets of paper, the backs of which are unlined and are called "fly sheets."  Id.

at ¶ 7.  Chin wrote down P.S.'s personal information on the fly sheets above his memo book entry for July 6, 2011, and the note written by P.S. is contained on the following fly sheet.  The lined page opposite the first fly sheet includes a 14-line-long entry describing the events at issue here, beginning with the time "1815."  This entry begins on the second line of the page, after an entry with time "1725," and is followed by entries on the same page for later events that day.  The note written by P.S., and at least one of the email addresses for her written, are in handwriting that is distinct from Chin's handwriting on the lined pages, and her signature appears to be in non-Roman characters.

According to the officers, after speaking with P.S., Chin conveyed to Cavada his exchange with her, at which point Cavada handcuffed Barua and the officers took him to the precinct.  The parties agree that no police officer made any comments to Barua about his race or ethnicity, or asked him about his religion, during the whole episode.

At the station house, Barua was given a Desk Appearance Ticket requiring him to appear in court on August 9, 2011, and then was released.  Later, Cavada testified, he (Cavada) met with the Assistant District Attorney, explained the circumstances of Barua's arrest, and gave the ADA the email address P.S. had provided.  Cavada never spoke with P.S., nor did he ever try to communicate with her.

Submitted by Barua with his opposition papers was a printout of an email produced by defendants with redactions and portions of the text cut off, but supposedly showing that an attempt by the DA's office to email P.S. resulted in an automated error message and that the email address "is false or belongs to no one."  Day Decl. ¶ 6, Ex. 8.  Prior to oral argument, at this Court's request, defendants submitted a more complete, unredacted version of the document.  As clarified by defense counsel at oral argument, this version shows that, on December 22, 2011, a person (represented by defense counsel to be a Korean-English translator retained by the DA's office) tried to email P.S. (according to defense counsel, at the behest of ADA Caitlin Nolan, who worked on Barua's prosecution, and whose name appears in the text of the document) at the email address P.S. gave Chin, which has a "hanmail.net" domain name. The text of the email was in Korean.  Contrary to the representation in the Day Declaration that the email address "is false or belongs to no one," the automated error message characterizes P.S.'s email address as an "[i]nactive inbox."

Barua was arraigned on a misdemeanor complaint, dated July 21, 2011, charging him with Forcible Touching, in violation of N.Y.P.L. § 130.52, and Sexual Abuse in the Third Degree, in violation of N.Y.P.L. § 130.55.  A superseding complaint, dated October 18, 2011, was subsequently filed, charging Barua with the same misdemeanors.  Cavada swore to both complaints.  The initial

complaint included allegations about what P.S. communicated to Chin; the superseding complaint did not.  The superseding complaint was dismissed for facial insufficiency by the Criminal Court, New York County, on February 28, 2012.  On April 15, 2013, the Supreme Court, New York County, granted Barua leave to file a late Notice of Claim.

Barua commenced this lawsuit on January 30, 2014, alleging a variety of federal and state law claims, including false arrest, malicious prosecution, negligence, negligent hiring and supervision, and violations of 42 U.S.C. § 1983 and the First, Fourth, Fifth, and Fourteenth Amendments.  Barua contends that he was stopped and arrested because of his race and national origin, that Cavada arrested him without probable cause, that he was prosecuted without probable cause, and that P.S. is a fiction invented by Cavada and Chin to cover up Barua's unlawful arrest.

Defendants move for summary judgment on all of Barua's claims.  Defendants argue that there is no genuine dispute that probable cause existed to arrest Barua, defeating his false arrest claims; that the malicious prosecution claim fails because probable cause existed to prosecute Barua and because Barua did not receive a favorable termination of his criminal case; that Cavada is entitled to qualified immunity; and that Barua's remaining claims fail for various reasons.

## II. LEGAL STANDARD

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To show a genuine issue of fact for trial, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1). The Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Thus, in ruling on a summary judgment motion, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) internal quotation marks omitted). However, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation . . . . Instead, the non-movant must produce specific facts indicating that a genuine factual issue exists." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citations and internal quotation marks omitted). "'If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may

be granted.'  To defeat a motion, 'there must be evidence on which the jury could reasonably find for the [non-movant].'"  Id. (quoting Liberty Lobby, 477 U.S. at 249-50, 252, 106 S. Ct. at 2511, 2512).

**B. Legal Analysis**

**1) False Arrest**

Plaintiff alleges that he was falsely arrested and also alleges violations of his rights under the Fourteenth Amendment. We treat his complaint as alleging false arrest under both New York law and 42 U.S.C. § 1983 and the Fourth Amendment as incorporated by the Fourteenth Amendment.  "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law."  Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks omitted). Therefore, we analyze Barua's state and federal false arrest claims under the same rubric.

The elements of false arrest are that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement and did not consent to it, and the confinement was not privileged.  Torres v. Jones, 26 N.Y.3d 742, 759, 47 N.E.3d 747, 760 (2016).  "For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged

10

if it stems from a lawful arrest supported by probable cause." Id.

The parties agree that the only element in dispute is whether Barua's arrest was privileged, that is, supported by probable cause.  "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.  The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (citations and internal quotation marks omitted).  "To ascertain the existence of probable cause, we look at the facts as the officers knew them in light of the specific elements of each crime.  While an officer need not have concrete proof of each element of a crime to establish probable cause for an arrest, probable cause means more than bare suspicion." Id.  In an action for false arrest, "[t]he defendant has the burden of raising and proving the affirmative defense of probable cause." Carrillos v. Inc. Vill. of Hempstead, 87 F. Supp. 3d 357, 376 (E.D.N.Y. 2015) (citing New York state case law).

At the time of Barua's arrest, the offense of Forcible Touching was defined as follows:

11

> A person is guilty of forcible touching when such person intentionally, and for no legitimate purpose, forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person; or for the purpose of gratifying the actor's sexual desire.
>
> For the purposes of this section, forcible touching includes squeezing, grabbing or pinching.

N.Y. Penal Law § 130.52 (McKinney) (amended effective Nov. 1, 2015). Sexual abuse in the third degree is defined as "subject[ing] another person to sexual contact without the latter's consent." N.Y. Penal Law § 130.55 (McKinney).

Defendants argue that the observations made by officers Cavada and Chin on the train established, at a minimum, reasonable suspicion to briefly detain Barua on the platform to investigate the matter further, and that probable cause to arrest existed based on the observations and P.S.'s report to Chin (as conveyed to Cavada). Defendants also argue that Cavada is entitled to qualified immunity.

In opposition, Barua offers two broad arguments, based on distinct factual theories. Barua's main argument is that a genuine dispute of material fact exists as to whether a woman corresponding to P.S. really existed and complained to Chin about Barua's conduct – or whether she is actually a fiction invented by officers Cavada and Chin to cover up that they targeted him and illegally stopped and searched him because of his race and/or national origin, and then to initiate criminal charges against him to force him to keep

12

quiet about their illegal activity.  According to this theory, officers Cavada and Chin are both committing extensive perjury about the circumstances of Barua's arrest, the notes purportedly written by P.S. in Chin's memo book are forgeries, and the failed attempt at emailing P.S. demonstrates that her purported email address was "false" – another part of the elaborate cover-up scheme concocted by Cavada and Chin.  Alternatively, Barua argues that even if no reasonable jury could credit his fabrication theory, probable cause still did not exist to arrest Barua "based on what Cavada and Chin observed."  Opp. at 14.

We first address Barua's fabrication theory.  Considering all of the admissible evidence and granting all reasonable inferences in Barua's favor, we find that no reasonable jury could credit this theory, which is hopelessly speculative and implausible.

To start, both officers Cavada and Chin testify that they personally observed Barua improperly touch P.S.  Their accounts (across both their depositions and their declarations) of the whole episode, including Chin's conversation with P.S. and the other events that unfolded on the platform at Fulton Street, are quite detailed, are internally coherent, and are highly consistent with each other in material respects.  Buttressing this testimony are the pages from Chin's memo book, which corroborate the officers' account in a convincing way that Barua fails to plausibly rebut.

As described above, see supra I, the memo book contains a rather detailed description of the circumstances of the arrest, a description located in chronological order between entries on the same page relating to other events, before and after Barua's arrest (and also located in chronological order with respect to the material on the preceding and succeeding pages of the memo book). See Letter of Ashley Garman in Support of Defs.' Mot. (Mar. 9, 2016), Ex. 5 (Chin Decl., Ex. A (DEF000084)). The entry for P.S.'s email address is on the fly sheet opposite this page, and her signed handwritten notes about the incident are on the following fly sheet. The location of Chin's written summary of the incident in the memo book indicates that the summary is a genuine and contemporaneous or nearly contemporaneous account, not one made after the fact to support a concocted story. The location of the notes written by P.S. and Chin on the fly sheets is consistent with this conclusion and with Chin's statement that he and P.S. made those notes on the scene. Moreover, P.S.'s alleged writing is in a script that is distinct from Chin's, and appears to be in non-Roman characters. Plaintiff's counsel did not dispute these facts at oral argument.

Yet another aspect of the memo book notes supporting P.S.'s authenticity is the email address she provided, which has a "hanmail.net" domain. Hanmail is a Korean email service. See, e.g., Benny Evangelista, "Twitter now available in South Korea,"

Seattle Post-Intelligencer, Jan. 18, 2011; "Apparent N. Korean Spam E-mails Sent to S. Korean Officers: Military," NORTH KOREA NEWSLETTER NO. 160, Yonhap English News, Yonhap News Agency of Korea, June 2, 2011.

In an attempt to rebut all of this evidence, Barua offers his own testimony as well as various other pieces of evidence, and relies heavily on inferences he believes can be drawn.  Beyond his denial that he improperly touched anyone, he points in particular to the fact that the DA office's attempt to email P.S. at her proffered address bounced back, that defendants have otherwise been unable to locate P.S., and that Cavada testified that he first noticed Barua at 42nd Street, then saw him step off and back onto the train at 14th Street, which, Barua claims, shows that Cavada "followed" him and singled him out based on his race and/or national origin.  Barua also testified that officers Cavada and Chin blindfolded him; declares that he was carrying a bag at the time of the incident, which someone he is unable to identify took from him; and says that it was only upon being fingerprinted that the officers told him that the reason for his arrest was that he improperly touched a woman.

Barua's factual theory, however, is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the

allegations made in his complaint." <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 554 (2d Cir. 2005).

"While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine 'whether the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." <u>Id.</u> at 554 (quoting <u>Liberty Lobby</u>, 477 U.S. at 252). In <u>Jeffreys</u>, the Second Circuit affirmed the grant of summary judgment against a Section 1983 plaintiff who alleged the police had beaten him and thrown him out a third-floor window, agreeing that there was no genuine dispute of fact that Jeffreys, a burglary suspect, had in fact jumped out the window. <u>Id.</u> at 555. Jeffreys, who claimed to have lost consciousness from the alleged beating and to have come to on the pavement below the window, offered testimony from relatives claiming he had told them the officers threw him out the window, and his own deposition testimony and prior statements to that effect. <u>Id.</u> However, his account was contradicted by his earlier admissions that he had in fact jumped out, and testimony by the officers and medical professionals who

concluded that Jeffreys had not lost consciousness.  Id. at 552-
53.

Courts hold that granting summary judgment is appropriate to
dismiss such clearly unbelievable claims, concluding that "when
the facts alleged are so contradictory that doubt is cast upon
their plausibility, [the Court is] authorized to 'pierce the veil
of the complaint's factual allegations,' dispose of 'some
improbable allegations', and dismiss the claim." Shabazz v. Pico,
994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, J.) (quoting
Denton v. Hernandez, 504 U.S. 25, 32 (1992)), reconsideration
denied, 1999 WL 345596 (S.D.N.Y. May 25, 1999), aff'd in relevant
part, vacated in part, 205 F.3d 1324 (2d Cir. 2000); see also Scott
v. Harris, 550 U.S. 372, 380 (2007) (holding that "Respondent's
version of events is so utterly discredited by the record that no
reasonable jury could have believed him").

We note in particular the following problems with Barua's
account:

- Barua's inference that Cavada "followed" Barua for
  improper reasons is unfounded.  Cavada and Chin were
  trained and experienced transit officers whose duties
  included patrolling the subway.  It is unremarkable that
  an officer trained to observe would be able to recall
  that he had first seen an individual a few minutes
  earlier on a platform while they both were waiting for

17

a train.   Barua has offered no direct evidence that Cavada and Chin focused <u>exclusively</u>, or even close to exclusively, on him before P.S. allegedly boarded the train at 14th Street.   Moreover, Barua does not offer any other probative evidence of improper discrimination.   The parties agree that no police officer made any comments to Barua about his race, or asked him about his religion, during the whole episode.   Barua states in his declaration that "no one else of any other race" was arrested despite the fact that the train was crowded, Barua Decl. ¶ 28, but this point is not meaningfully suggestive of racial discrimination.

- Barua's declaration suggests that Cavada handcuffed him immediately after they got off the train at Fulton Street.   Barua Decl. ¶ 5.   In contrast, Barua testified in his deposition that he was not handcuffed until after he was told to sit on the bench at Fulton Street, Barua Dep. Tr. 56.1-13, suggesting that the officers indeed engaged in the investigation they claim to have engaged in before taking Barua into full custody.   (Barua also testified in his deposition that he did not remember which officer handcuffed him.   <u>Id.</u> at 54:20-21.)   Barua's deposition testimony controls because "[a] party may not, in order to defeat a summary judgment motion, create

a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." <u>AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.</u>, 626 F.3d 699, 736 (2d Cir. 2010).

- Barua declares that Chin could not have spoken with P.S. on the platform at Fulton Street because Chin blindfolded him. Barua Decl. ¶ 5. This claim is contradicted by Barua's deposition testimony that he did not see if both officers were standing right next to him while he was sitting down on bench, because he was blindfolded, and that he did not know which officer blindfolded him. Barua Dep. Tr. 57:3-6, 55.

- There are numerous innocuous reasons why the email to P.S. may have bounced back. For example, P.S. may have given an incorrect email address because she did not want to give her real email address – after all, she did not want to leave any other contact information. Alternatively, the email address may have been hers when she gave it, but she may have closed the account in the intervening five months before the DA's office tried contacting her. Or perhaps the account did not accept messages from the sender's domain or account.

In essence, Barua offers a highly speculative conspiracy theory that Cavada and Chin engaged in an elaborate, sophisticated

scheme to fabricate evidence against him.  This scheme supposedly entailed, among other things, the invention of a Korean victim and details as to her identity, the forgery of her handwriting and (in non-Roman script) signature, the generation of an email address for her using a Korean email provider's domain name, the conveyance of all of this misinformation to the DA, and extensive and well-coordinated perjury by both Cavada and Chin before multiple courts of law.  But Barua's theory is contradicted by his own deposition testimony, by Cavada's and Chin's testimony, and by documentary evidence.

Nor has Barua proffered a credible motive for the alleged misconduct.  According to Barua, it was designed to cover up the illegal stop and search he was subjected to, even though Barua admittedly suffered no physical injury and was detained for just a few hours.  As acknowledged by plaintiff's counsel, <u>see</u> Oral Arg. Tr. 18:18-19:1 (agreeing that the alleged scheme "doesn't make any sense"), the total disproportion between the risks and the benefits to the officers of engaging in such a scheme is another factor rendering it fantastic.[5]  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 596 (1986) ("[T]he absence of any plausible motive to engage in the conduct charged

---

[5] Barua's claim that the officers blindfolded him on the subway platform is contradicted by Barua's own testimony wherein he claims that Chin could not have talked with P.S. and wherein he claims that he saw his acquaintance Mamadu during his detention.

is highly relevant to whether a genuine issue for trial exists within the meaning of Rule 56(e)." (internal quotation marks omitted)).

Having found it beyond genuine dispute that P.S. existed and spoke to officer Chin, we turn to Barua's alternative theory, that the officers lacked probable cause to arrest him at any point, even after receiving corroboration from P.S.  Defendants argue that, at a minimum, reasonable suspicion existed to stop Barua based solely on what the officers observed in the train, that Cavada had probable cause to arrest Barua based on the officers' observations and the communication with P.S., and, in the alternative, that Cavada is entitled to qualified immunity.

"[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity. Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (citations and internal quotation marks omitted).  Moreover, under the "fellow officer" rule, "even if an arresting officer lacks personal knowledge sufficient to establish probable cause, the arrest will be lawful if the officer acts upon the direction of or as a result of communication with a superior or [fellow] officer or another police department provided that the police as a whole were in possession of information sufficient to constitute probable cause to make the

arrest." <u>People v. Ramirez-Portoreal</u>, 88 N.Y.2d 99, 113, 666 N.E.2d 207, 215 (1996); <u>accord</u> <u>United States v. Colon</u>, 250 F.3d 130, 135 (2d Cir. 2001)). The arresting officer's corroboration of such a report with his or her own observations further supports probable cause in such a situation. See <u>Panetta</u>, 460 F.3d at 397.

We reject Barua's argument that, even after Chin's exchange with P.S., the officers lacked probable cause to believe that Barua's touching of P.S. was offensive and non-consensual. Chin has specifically testified that P.S. confirmed to him that the offensive nature of the touching. The officers' belief was further supported by their experience and visual observations, and by the fact and language of P.S.'s written statement, even if the statement could have been more explicit about the offensiveness. In light of this evidence, Barua's attempt to attach significance to the fact that P.S. did not "cry out," <u>e.g.</u>, Day Decl. at ¶ 7; Barua Decl. ¶ 25, is deeply misplaced.

Second, Cavada had a sufficient basis to initially stop Barua for purposes of further investigation based on his observations of Barua's conduct in the train. See, e.g., <u>United States v. Diaz</u>, 802 F.3d 234, 238-39 (2d Cir. 2015) ("The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity . . . .   [T]he reasonable suspicion standard . . . asks . . . whether a reasonable officer

would suspect unlawful activity under the totality of the circumstances." (citations and internal quotation marks omitted)). Indeed, plaintiff's counsel essentially acknowledged this point at oral argument, though they incongruously proceeded to dispute that the officers' observations were sufficient here.  Oral Arg. Tr. 5:13-7:11, 17:16-18:3.  Cavada testified that he saw Barua press his groin area against P.S. twice, once initially and then again after she moved and glanced over her shoulder.  Cavada, who had training and experience in patrolling the subway, also believed that P.S. looked uncomfortable.  These observations established a reasonable suspicion that Barua had engaged in unlawful touching.

We further conclude that any reasonable jury would find that the officers' handling of the situation prior to Barua's being handcuffed was reasonable and therefore proper under the Fourth Amendment.  "A Fourth Amendment reasonableness inquiry asks 'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?'"  United States v. Newton, 369 F.3d 659, 673-75 (2d Cir. 2004) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968) (internal quotation marks omitted))).  "[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes."  Id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)

(plurality opinion)).  "At the same time, however, the law recognizes the 'important need to allow authorities to graduate their responses to the demands of any particular situation.'"  Id. (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985) (internal quotation marks omitted)).

Here, Barua was detained only briefly on the platform, so that Chin could speak to P.S. to investigate further, before he was handcuffed and taken to the precinct.  Barua was not handcuffed until after the corroboration.  Although the officers did restrain Barua and show him their badges, and, according to Barua, Cavada drew his gun partially out of the holster, Barua Decl. ¶ 7,[6] these actions were justifiable in the circumstances.  Restraining Barua was the only practical way to insure that he would not leave the area, and, given that the officers were in plainclothes, it was necessary for them to demonstrate their authority.  (Indeed, the reasonableness of the officers' actions is confirmed by Barua's testimony that he "was shocked at being suddenly apprehended," "verbally protested, screaming that Cavada let me go," Barua Decl. ¶ 7, not "know[ing] if they are [sic] police officers or not" - but "[w]hen they showed ID and pistol, then I understand [sic]."  Barua Dep. Tr. 47:21-48:1.).  Thus, even when we construe the

---

[6] Barua also states in his declaration that Cavada "threatened to shoot [him]" at this time.  Decl. at ¶ 7.  But in his deposition Barua was repeatedly asked what the officers said to him when they grabbed him, and his answers included no mention of any verbal threat to shoot.  The deposition testimony controls. AEP Energy, 626 F.3d at 736.

evidence in the light most favorable to Barua, Cavada acted reasonably for purposes of the Fourth Amendment, not subjecting Barua at any point to an unlawful seizure.[7]  Accordingly, Barua's false arrest claims are dismissed.

### 2) Malicious Prosecution

"[T]o prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  The elements of malicious prosecution under New York law are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Manganiello, 612 F.3d at 160-61.

Defendants argue that there was probable cause to prosecute Barua and that the criminal proceeding was not terminated in Barua's favor.  The Court agrees that probable cause existed to support the prosecution and/or that the named defendants cannot be

---

[7] We also believe that, even if the initial stop were considered an arrest, Cavada would be entitled to qualified immunity because there was "arguable probable cause at the time of the arrest — that is, . . . officers of reasonable competence could disagree on whether the probable cause test was met." Gonzalez v. City of Schenectady, 728 F.3d 149, 157 (2d Cir. 2013).

said to have "continued" the prosecution against Barua after its initiation; therefore, we do not reach defendants' other argument.

Probable cause in the malicious prosecution context has been varyingly defined as, on the one hand, "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty," Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003), and, on the other, "probable cause to believe that [the prosecution] could succeed," id.  The Second Circuit in Boyd found no conflict between these two formulations but applied the latter one in finding that the question of whether there was probable cause to prosecute turned on a disputed question of fact about whether the arrestee made a key inculpating statement before he was arrested (in which case it would have been admissible) or after (which would have made it inadmissible).  Id. at 76-77, n.7.

Where, as here, "probable cause existed for the arrest itself, a plaintiff pursuing a malicious prosecution claim must establish that probable cause somehow 'dissipated' between the time of arrest and the commencement of the prosecution. 'In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact.'" Johnson v. City of New York, No. 08 CIV. 5277 (SHS), 2010 WL 2292209, at *6 (S.D.N.Y. June 7, 2010) (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)).

In support of his malicious prosecution claim, Barua primarily relies again on his fabrication theory, claiming that the defendants and Chin "fabricated evidence . . . and fabricated the charges in order to intimidate [Barua] from coming forward to speak about their illegal and unconstitutional conduct." Opp. at 17. Because, as discussed above, no reasonable jury could find Barua's fabrication theory credible, that theory cannot sustain his malicious prosecution claim.

Alternatively, Barua argues that even "if a trier of fact believes there was probable cause to stop him, the probable cause dissipated between time [sic] of the arrest and the initiation of the prosecution." Id. at 18. Specifically, Barua argues that the defendants unlawfully "continued to prosecute although the alleged witness stated that she did not want to give her address and telephone number," and "even after it was evident that the email address was false." Id.

We have already held that probable cause existed to arrest Barua after P.S. registered her complaint with Chin. We reject the suggestion that probable cause to prosecute was nevertheless lacking from the outset because P.S. did not leave her address and telephone number, even though she left her name and email address. The facts and circumstances available at that point in time were certainly sufficient to believe that a prosecution could be successful.

As for the second prong of plaintiff's dissipation argument, any factual basis for it is no longer viable.  The email bounced back because the account was "inactive," not "false."  But most significant at this juncture was the fact that that the prosecution was in the hands of the District Attorney, not the police.  As an initial matter, the record is devoid of competent evidence to suggest that Cavada learned while the prosecution was ongoing that the email bounced back.[8]  Even if he did learn of that fact then and continued to participate in the prosecution as a witness (as plaintiff's counsel represented at oral argument), he cannot be held liable for malicious prosecution on that basis.  Frustration that the prosecution has immunity is not a basis to sue Cavada. See White v. Frank, 855 F.2d 956, 961-62 (2d Cir. 1988).

### 3) Racial Profiling and Discrimination

The complaint alleges that defendants discriminated against Barua because of his race and national origin in violation of his constitutional and statutory rights.  We construe the complaint as alleging, pursuant to Section 1983,[9] violations of Barua's rights

---

[8] At oral argument, Barua's counsel represented that Barua moved for the superseding complaint's dismissal, and that officers Cavada and/or Chin responded by affidavit to the motion, showing that they continued to participate in the prosecution.  However, the evidentiary record does not make clear when Barua moved for dismissal or show that (or when) Cavada and/or Chin responded to the motion by affidavit.  Cavada testified in his deposition that he recalled appearing in court once for Barua's case.

[9] Defendants also address Barua's discrimination claim under 42 U.S.C. § 1981, which allows an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of

28

under the Fourteenth Amendment's Equal Protection Clause to be free from impermissible racial or national origin discrimination. Defendants argue that Barua's Equal Protection claims fail because he "has not adduced any evidence in discovery of similarly-situated persons who were treated differently from him."  Mot. at 17. Defendants further argue that plaintiff has put forth no evidence that his arrest was motivated by race or any other impermissible consideration.  Id.  Plaintiff contends in opposition that he was subjected to racial profiling and that a genuine issue of fact exists as to "whether similarly situated persons outside plaintiff's protected class would not have been stopped under the same circumstances."  Opp. at 26.

"[T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race . . . ." Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (internal quotation marks omitted).  "[R]acial discrimination under the Equal Protection Clause requires a racially discriminatory purpose

---

any rights, privileges, or immunities secured by the Constitution and laws." To establish a claim for a violation of Section 1981, a plaintiff must establish (1) that he is a member of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities.  Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).  Because the standard for establishing discrimination under Section 1981 is the same as that under the Equal Protection Clause, see id., our analysis of Barua's equal protection claim applies equally to any claim he may allege under Section 1981.

. . . ."  Howard v. Senkowski, 986 F.2d 24, 26 (2d Cir. 1993) (internal quotation marks omitted).  "[T]he test is whether a discriminatory purpose has been a motivating factor in the decision."  Id. at 27 (internal quotation marks omitted).  "When the issue is . . . whether or not an impermissible consideration motivated the challenged action, . . . pretext analysis employs the familiar three-step approach [of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)]."  Id. Thus, "the claimant must present a prima facie case sufficient to establish an inference of improper motivation; the party accused of discrimination must then articulate race-neutral reasons for the challenged action; the claimant then bears the ultimate burden of persuasion to show that the articulated reasons are pretextual and that the 'real' reason is the impermissible one."  Id. at 25.

   In presenting a prima facie case of discrimination, "a plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."  Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001).  However, "a plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted; that is

because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." Id. at 109.

As one court has observed, "[t]he Second Circuit has recognized that most claims brought under the Equal Protection Clause on the basis of racial discrimination fall into one of two categories. In the first category are claims in which a plaintiff asserts that she was innocent of wrongdoing but has nonetheless been the subject of some wrongful action (arrest, termination or employment, disciplinary proceeding, etc.) because of race. In the second category are claims by a plaintiff asserting that regardless of her guilt or innocence, certain laws or penalties were applied to her because of her membership in a group whereas they were not applied to others similarly situated individuals who are outside her group. Powell v. Bucci, No. 04-CV-1192, 2006 WL 2052159, at *8 (N.D.N.Y. July 21, 2006) (citations omitted).

Barua has offered no evidence to support a pure selective enforcement theory to the effect that, even assuming legal justification for his arrest and prosecution, he was singled out on account of his race or national origin. Barua states in his declaration that "no one else of any other race" was arrested despite the fact that the train was crowded, Barua Decl. ¶ 28, but offers no evidence that any other person had been observed and

accused by a victim to have engaged in improper touching.[10]   Nor
is there any reason to assume that multiple crimes of a similar
nature had been committed on the same subway car.

     The gist of Barua's theory, rather – without any evidence –
is that he was stopped, arrested, and prosecuted simply because of
his race and/or national origin and without permissible legal
justification.   We have already found that his seizure and
prosecution were legally justified, however.   Thus, defendants
have offered a legitimate, non-discriminatory justification for
their actions.   As discussed above, see supra II.B.1, in light of
the totality of the evidence, no reasonable inference of
discriminatory intent can be drawn from the facts here to show
that the "the articulated reasons" given by Cavada and Chin for
Barua's arrest "are pretextual."   Howard, 986 F.2d at 26; see also
United States v. Davis, 11 F. App'x 16, 18 (2d Cir. 2001)
(affirming denial of motions to suppress, finding insufficient
evidence of intentional discrimination where officer had
reasonable suspicion for stopping defendant); Miller v. City of
New York, No. 11 CIV. 6663 JSR, 2012 WL 2524248, at *6–7 (S.D.N.Y.
June 26, 2012) (on insufficiently developed record, holding that
police officer "may, in his deposition, identify a legitimate,
non-discriminatory reason for stopping Miller that would preclude

---

[10] He also does not offer any probative evidence of the races or national origins
of the other passengers.

a reasonable jury from finding for Miller on this claim"). Therefore, Barua's discrimination claims are dismissed.

### 4) Other claims

Defendants are also entitled to dismissal of Barua's Monell, negligence and negligent hiring and supervision, First Amendment, and Fifth Amendment claims.

Barua's Monell claim fails because, as concluded above, no reasonable jury could find an underlying constitutional violation here, see Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007); moreover, Barua has failed to offer any evidence of "an official policy or custom," id.

Barua's untethered negligence and negligent hiring and supervision claims also fail for several independent reasons. Under New York law, a plaintiff "may not recover under general negligence principles" for damages arising from her arrest and detention, but only under "the torts of false arrest and imprisonment and malicious prosecution." Ferguson v. Dollar Rent A Car, Inc., 102 A.D.3d 600, 601, 959 N.Y.S.2d 55, 56 (1st Dep't 2013); Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994). Moreover, for the reasons discussed above, no reasonable jury could find an underlying tort to underpin Barua's claim for negligent hiring or supervision. Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (citations and internal quotation marks omitted). Even assuming that Barua could establish the other

33

elements of a negligent hiring or supervision claim against the
City and that governmental immunity should not apply, Barua has
not offered any evidence that the City knew or should have known
of any propensity on the part of Cavada or Chin to engage in the
allegedly unlawful conduct.  The negligence-based claims are also
time-barred under the one year and 90 day statute of limitations
of New York General Municipal Law ¶ 50-i(1)(c).

As for Barua's First Amendment claim, defendants are also
correct – and Barua does not dispute – that Barua has pleaded no
facts in his Complaint, and has adduced no evidence, regarding any
expressive activity chilled as a result of Cavada's alleged
conduct, or that Cavada's actions were "motivated or substantially
caused by plaintiff's exercise of his First Amendment right[s],"
as required for a First Amendment retaliatory arrest claim.  See
Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010).

Finally, Barua invokes the equal protection component of the
Fifth Amendment's Due Process Clause in support of his racial
discrimination claim, but we have already concluded that Barua's
discrimination claim fails.  (The Fifth Amendment's Due Process
clause, including its equal protection component, applies only to
the federal government, not to the states.  See Dusenbery v. United
States, 534 U.S. 161, 167, 122 S. Ct. 694, 699, 151 L. Ed. 2d 597
(2002); Bolling v. Sharpe, 347 U.S. 497, 498-500, 74 S. Ct. 693,

694-95, 98 L. Ed. 884 (1954), supplemented sub nom. Brown v. Bd. of Educ., 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955).)

**IV. CONCLUSION**

For the foregoing reasons, defendants' motion is granted in all respects.  The complaint is dismissed with prejudice.


**SO ORDERED.**

Dated:    New York, New York
          December 28, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE